**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**PORTLAND DIVISION**

HAROLD VISSER,

          Plaintiff,                    Case No. 3:13-cv-508-ST

          v.                       **FINDINGS AND RECOMMENDATION**

COMMISSIONER OF SOCIAL SECURITY,

          Defendant.

**STEWART, Magistrate Judge:**

Plaintiff, Harold Visser ("Visser"), seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. This court has jurisdiction under 42 USC § 405(g) and § 1383(c)(3). For the following reasons, the Commissioner's decision should be reversed, and this case should be remanded for an immediate award of benefits.

///

1 -- FINDINGS AND RECOMMENDATION

**ADMINISTRATIVE HISTORY**

Visser filed applications for DIB and SSI on December 9, 2009, alleging that he became disabled on April 1, 1996, due to a head injury, vision loss in his right eye, back pain, and short term memory loss.  Tr. 23-29, 280.[1]  To obtain DIB, Visser must prove that his disability existed on or before his date last insured ("DLI").  *Tidwell v. Apfel*, 161 F3d 599, 601 (9th Cir 1998).  Visser's DLI is September 30, 2002.  Tr. 22.

After the Commissioner denied his DIB application initially and upon reconsideration (Tr. 32-39), Visser requested a hearing that was held on November 7, 2011.  Tr. 449-75.  Administrative Law Judge ("ALJ") Steve Lynch issued two decisions dated November 14, 2011.  The ALJ denied the DIB application, finding Visser not disabled prior to his DLI of September 30, 2002.  Tr. 14-22.  However, the ALJ granted the SSI application, finding that Visser was disabled as of December 9, 2009, the SSI application date.  Tr. 10A-H.  The Appeals Council denied Visser's subsequent request for review on May 19, 2012 (Tr. 3-8), making the ALJ's denial of DIB the final Agency decision.  20 CFR § 404.981.  Visser now seeks judicial review of that decision.

**BACKGROUND**

Born in 1963, Visser was 39 years old on his DLI.  Tr. 23.  Visser graduated from high school in 1981.  Tr. 281, 382.  He has worked periodically as a cabinet assembler, countertop assembler, lumber marker, painter's helper and janitor.  Tr. 282, 299-303.  After April 1, 1996, his alleged onset date, he has performed some work, but not at a level consistent with substantial gainful activity ("SGA").  Tr. 259-60.  He last worked on November 30, 2006.  Tr. 281, 455-56.

///

///

---

[1]  Citations are to the page(s) indicated in the official transcript of the record filed on August 7, 2013 (docket #11).

2 -- FINDINGS AND RECOMMENDATION

**FACTS**

In October 1983, two years after high school, Visser sustained a significant head injury. Tr. 176-83, 381.  He was immediately hospitalized and underwent a "right craniotomy, subfrontal with evacuation of epidural hematoma, repair of dural lacerations with pericranial graft, then debridement of brain lacerations."  Tr. 182-83.

On November 8, 1983, cognitive testing by Roy S. Fowler, Jr., PhD, suggested that Visser was capable of considerable intellectual processing with only very mild new learning deficits, but showed considerable cognitive difficulties, described as "classical 'frontal' problems."  Tr. 176-77.  One month later, on December 9, 1983, an Oregon Health Sciences University progress report determined that Visser suffered from permanent right eye blindness and some cognitive deficits post-traumatic brain injury, primarily "frontal lobe syndrome" characterized by "lack of impulse control and emotional lability."  Tr. 181.  However, he "could do simple calculations in his head" and remember "3 of 3 objects at 1 and 5 minutes."  Tr. 179. "He was accurate, but lost his place on a number of occasions and did not seem to attend to the task very well."  Tr. 180.  The examiner opined that Visser had "made a remarkable recovery in 6 weeks" and that he would "continue to improve for the next year and indeed possibly for 4-5 years thereafter."  Tr. 181.

Visser reported experiencing some post-traumatic seizure activity in 1988.  Tr. 118-21. On July 17, 1988, an MRI of Visser's brain showed a "right frontal polar cyst and evidence of atrophy, presumably related to trauma and infarction of this area in the past."  Tr. 121.  As a result, his treating physician, Paul Vriesman, MD, diagnosed Visser in August 1988 with grand mal seizures and opined that he could not work with dangerous machinery or at heights.  Tr. 117.

In March 2010, Donald E. Lange, PhD, DABFM, DABPS, conducted a comprehensive neuropsychological examination to determine Visser's level of cognitive and intellectual functioning.  Tr. 87-101.  Visser reported that since his accident in 1983, he experienced significant cognitive difficulties and memory problems.  Tr. 87.  Indicating that Visser was "status post TBI [traumatic brain injury] sustained in a 1983 MVA [motor vehicle accident]," Dr. Lange found that Visser was "functioning at least in the average range on many cognitive and intellectual tasks, even though his performance was inconsistent across tests and he had "significant cognitive deficits."  Tr. 94, 97.  Visser's "most notable difficulties relate to his inconsistency in attention, concentration, freedom from distraction and mental control and tracking."  Tr. 94.  "The hallmark of his performance is extremely slowed psychomotor speed as well as mental efficiency that will generally undermine virtually all of his performance including cognitive and intellectual functioning."  Tr. 97.  As a result, when tasks are complex, Visser "becomes easily overloaded" and has "difficulty multitasking."  *Id.*  Dr. Lange diagnosed Visser with cognitive disorder NOS, "with often extremely slow psychomotor speed and mental efficiency undermining his general cognitive performance and information processing."  *Id.*

## DISABILITY ANALYSIS

Disability is the "inability to engage in any [SGA] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A); 20 CFR § 404.1509.  The ALJ engages in a sequential inquiry encompassing one to five steps to determine whether a claimant is disabled within the meaning of the Act.  20 CFR § 404.1520(a); *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

4 -- FINDINGS AND RECOMMENDATION

At step one, the ALJ determines if the claimant is performing SGA. If so, the claimant is not disabled. 20 CFR § 404.1520(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR § 404.1520(a)(4)(ii) & (c). Absent a severe impairment, the claimant is not disabled. *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR § 404.1520(a)(4)(iii) & (d); 20 CFR Pt 404, Subpt P, App 1 (Listing of Impairments). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 CFR § 404.1520(e); Social Security Ruling ("SSR") 96-8p, *available at* 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR § 404.1520(a)(4)(iv) & (e). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy. 20 CFR § 404.1520(a)(4)(v) & (g); *Tackett*, 180 F3d at 1099; *Bowen v. Yuckert*, 482 US 137, 142 (1987).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs

5 -- FINDINGS AND RECOMMENDATION

exist in the national economy within the claimant's RFC.  *Id*.  If the Commissioner meets this burden, then the claimant is not disabled.  20 CFR § 404.1520(a)(4)(v) & (g).

## ALJ'S FINDINGS

At step one, the ALJ found that Visser had not engaged in SGA after the alleged onset date through the DLI.  Tr. 16.  At step two, the ALJ found that Visser had severe impairments consisting of a traumatic brain injury, right eye blindness, alcohol dependence, a cognitive disorder, and a seizure disorder.  Tr. 17.  At step three, the ALJ found that Visser did not have an impairment or combination of impairments that met or medically equaled a listed impairment. *Id*.

Assessing Visser's residual functional capacity ("RFC"), the ALJ determined that he could perform medium work, but should not work at unprotected heights or around dangerous machinery, should not do any work requiring binocular vision or depth perception, is limited to entry level work in a routine environment, and should have less than occasional interaction with the public.  Tr. 18.  At step four, the ALJ found Visser has no past relevant work, but at step five, based on the testimony of a vocational expert ("VE"), determined that he could perform jobs that exist in significant numbers in the national economy, including medium unskilled work as an industrial clearer and dish washer.  Tr. 21-22.  The ALJ therefore concluded that Visser was not disabled from the alleged onset date through his DLI.  Tr. 22.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028,

1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing

court may not substitute its judgment for that of the Commissioner.  *Ryan v. Comm'r of Soc. Sec.*

*Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481 F3d 742, 746 (9th Cir

2007).  Where the evidence is susceptible to more than one rational interpretation, the

Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn

from the record.'"  *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), quoting *Batson v.*

*Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).

## FINDINGS

Visser asserts that the ALJ erred at step three by failing to find that the severity of his

impairments meet the criteria of Listing 12.02(C)(2) for organic mental disorders before his DLI

of September 30, 2002.  That Listing provides in relevant part as follows:

> C.  Medically documented history of a chronic organic mental disorder of
> at least 2 years' duration that has caused more than a minimal limitation of
> ability to do basic work activities, with symptoms or signs currently
> attenuated by medication of psychosocial support, and one of the
> following: . . .
>
> 2.   A residual disease process that has resulted in such marginal
> adjustment that even a minimal increase in mental demands or change in
> the environment would be predicted to cause the individual to
> decompensate; . . .

At the hearing, Miller Garrison, PhD, testified based on his review of the medical records

from 2010 (Tr. 340-95) and some older records in the Title II file, including Visser's cognitive

testing in 1983.  Tr. 461, 463-64.  He opined that Visser's condition of a cognitive disorder NOS

met the criteria for Listing 12.02(C)(2) based on Dr. Lange's 2010 neuropsychological

examination.  Tr. 464.  When the ALJ asked if there is "sufficient information in the materials

you're reviewed to show you when the onset for that [occurred]," Dr. Garrison responded:

"There really isn't.  I think that Dr. Lang[e] pretty much assumes that it's, it's from the accident.

7 -- FINDINGS AND RECOMMENDATION

I don't know that we have anything that would argue against that." Tr. 465.  As to whether the

severity of Visser's impairments met Listing 12.02(C)(2) after the 1983 accident and before

Dr. Lange's evaluation in 2010, he explained that "we know that he was here, and we know that

he's here, what, 28 years later, but we don't know a lot about what happened in between, other

than he — we, we know that he was drinking some, and we know that he's had some seizures."

Tr. 467.  In response to further questioning by Visser's attorney, he agreed that Dr. Lange was

saying that "this is the result of the brain injury, and this is not a result of any alcohol use."

Tr. 470.  Based on that testimony, the ALJ concluded that:

> based on the record available to him, Dr. Garrison was unable to establish a disability onset date as his conclusions were based primarily on the comprehensive neuropsychological examination of Donald E. Lange, PhD, performed on March 3, 2010.  This examination was administered to document the claimant's then-current level of cognitive and intellectual functioning.  Dr. Lange did not have any of the claimant's past medical history for review (Ex. 14F).  The undersigned finds it not suitable to use Dr. Lange's and Dr. Garrison's opinions to determine the claimant's level of functioning prior to his [DLI] of September 30, 2002, and therefore these opinions are given limited weight, with greater weight given to the assessments and findings those who dealt with the claimant prior to his [DLI], with additional consideration given to the claimant's work history and his own self-report noted in the record and detailed above.

Tr. 20.

Accordingly, at step three, the ALJ found that Visser's mental impairments fell short of

meeting either the paragraph B or paragraph C criteria of Listing 12.02.  Tr. 17.  He then

determined at steps four and five that Visser was not disabled from April 1, 1996, through

September 30, 2002, because he retained the RFC to perform medium work with limitations.

Tr. 21.

The issue is whether substantial evidence in the record supports the ALJ's finding that

Visser's mental impairments caused by his 1983 accident were not sufficiently severe to meet

8 -- FINDINGS AND RECOMMENDATION

Listing 12.02(C)(2) by September 30, 2002.  Although the ALJ declined to establish an onset date for the DIB application, he did find that Visser was disabled by December 9, 2009, when he filed his SSI application.  Thus, the ALJ apparently concluded that Visser's mental impairments progressed to the point of meeting Listing 12.02(C)(2) sometime after his DIL of September 30, 2002, and before December 9, 2009.

One problem with the ALJ's analysis is that Visser's mental impairments are caused by a traumatic head injury in 1983.  For such disabilities, the Social Security regulations provide guidance that the ALJ ignored.  "For disabilities of traumatic origin, onset is the day of the injury if the individual is thereafter expected to die as a result or is expected to be unable to engage in [SGA] for a continuous period of at least 12 months."  SSR 83-20, 1983 WL 31249, at *2.  Since Visser is not expected to die as a result of his head injury, his onset date is 1983 if he "is expected to be unable to engage in SGA for a continuous period of at least 12 months."

The Commissioner argues the ALJ did not commit error by ignoring this regulation because Visser did engage in SGA "for a continuous period of at least 12 months" after his injury in 1983.  After 1983, the record shows only that Visser earned sporadic income ranging from nothing at all to $4,000 a year.  Tr. 44-45.  However, he did earn SGA level income in 1995 of about $11,000.  Tr. 45.  As revealed by the Disability Report (Form SSA-3367), he worked at Amrak from February 1995 to March 1996 for 8 hours per day, 5 days per week.  Tr. 282.

This evidence is not conclusive, however.  At best, the record supports the conclusion that Visser worked from February 1995 to March 1996, earned SGA level income in 1995, and did not earn SGA level income in 1996.  He could well have earned SGA level income in 1995 for work performed in less than 12 months.  Moreover, in support of being disabled since 1983, Visser testified that his employers in 1995 and 1996 "were probably a little more accommodating

9 -- FINDINGS AND RECOMMENDATION

to me" because they were acquainted with his mother.  Tr. 459, 472-73.[2]  More importantly, the

ALJ never found that Visser worked continuously at SGA for at least 12 months.  The court is

"constrained to review the reasons the ALJ asserts," *Connett v. Barnhart*, 340 F3d 871, 874 (9th

Cir 2003), and "cannot affirm the decision of an agency on a ground that the agency did not

invoke in making its decision."  *Pinto v. Massanari*, 249 F3d 840, 847 (9th Cir 2001) (citation

omitted).

In any event, the issue is not whether 1983 is the proper onset date, but instead is whether

Visser's mental impairments met Listing 12.02(C)(2) at any time prior to his DIL of

September 30, 2002.  In that regard, as Dr. Garrison admits, the record is sparse regarding

Visser's cognitive recovery following the 1983 accident and before Dr. Lange's March 2010

evaluation.  Given the limited record, Dr. Garrison conceded that it was necessary to rely on

general trends of recovery from traumatic brain injuries, instead of evidence specific to Visser's

case.  Tr. 468 ("[I] think what we pretty much have here is probabilities about cases, because we

don't have a whole lot of information between '83 and 2010.").  On that premise, he testified that

any change in Visser's cognitive ability, whether improvement or deterioration, was unlikely

after the one-year mark.  *Id* ("[T]he gains after a year to two-year post injury are smaller, and

slower, and rarer.").

Visser argues that insufficient evidence supports the ALJ's inference that Visser's mental

impairments improved after his injury to the point of not being disabled through September 30,

2002, yet then deteriorated to the point of meeting Listing 12.02(C)(2) by the time of

Dr. Lange's 2010 evaluation.  The Commissioner argues that medical evidence supports no other

rational inference.

---

[2]  Visser identified his employer in 1996 as "AMAR," but, given the time period involved, this appears to be the same employer as listed in the Disability Report.

10 -- FINDINGS AND RECOMMENDATION

The ALJ relied on Visser's notable improvement in cognitive functioning six weeks after his injury. Tr. 19. During this progress examination, the evaluator's impression of Visser was that he could continue to improve for the next year and "possibly for 4-5 years thereafter." Tr. 181. However, after Dr. Garrison reported the usual benchmark for improvement as one to one-and-a-half years post-traumatic brain injury, the ALJ himself noted the unreliability of that early evaluation. Tr. 466 ("[B]ecause they were so close in time to the, to the date of the TBI, I don't think they'd be helpful in . . . determining his . . . condition a year after the injury.").

The ALJ also gave great weight to Visser's treatment providers during that time, especially the 1988 opinion of Dr. Vriesman. After diagnosing Visser with grand mal seizures, Dr. Vriesman restricted him to activities that did not involve dangerous machinery or heights. Tr. 117. The ALJ noted the absence of other restrictions in Dr. Vriesman's opinion, stating that Visser "could otherwise perform all other activities without limitation." Tr. 19. However, Dr. Vriesman's opinion was responsive only to Visser's seizures. He was not assessing Visser's psychomotor speed, cognitive performance, or other functioning relevant to Listing 12.02. According to Dr. Garrison, decompensation is noted when "anxiety increases. Performance, overall cognitive performance diminishes. Psychomotor speed, which is usually slow, slows down." Tr. 464. Although Dr. Vriesman consulted a MRI scan and a neurologist for his diagnosis, he did not complete a neuropsychology evaluation or opine on Visser's current cognitive limitations in the workplace. The ALJ referenced Dr. Vriesman's report as the only functional capacity opinion in the record before the DLI. Tr. 19. However, as it did not cover Visser's functioning as it is relevant to the Listing 12.02 criteria, this medical opinion is not substantive evidence of the severity of Visser's impairment in 1988.

The most relevant pre-DLI evidence is a lay witness statement by Major Lee Jones ("Jones"), which the ALJ gave "some weight." Tr. 20. Before the accident in 1983 and until approximately 2003, Jones and his father hired Visser for light construction and work in their shop. Tr. 175. Jones's impression of Visser's work was that "he gets confused doing tasks that he used to be great at and distracted very easily." *Id.* Jones's specific observations were consistent with Dr. Garrison's opinion that: "Broadly, what Dr. Lang[e] talks about is, undermines information processing, and leading to a variety of cognitive deficits. Some problems comprehending/understanding what you're asking him to do, overwhelmed and anxious when he can't process information quickly." Tr. 464-65. While employed by Jones, Visser abandoned work in the middle of a task "to do something else without finishing." Tr. 175. Likewise, if "he had a job ringing up customers behind a counter he would many times abandon his post in order to stock shelves." *Id.* He often forgot instructions. "For example, I would call [Visser] over for some work and tell him what we needed, but by the time he got to the site he had forgotten what I'd asked him to do." *Id.* Jones also testified to evidence of slow psychomotor speed, stating that Visser "could not prioritize tasks, and he works very slowly." *Id*.

The ALJ also relied on the lack of evidence "indicating a significant deterioration of the claimant's medical condition or functional capacity" around the alleged onset date of April 1, 1996, when he stopped working. Tr. 19. However, as evidenced by Jones's testimony, Visser was largely employed out of kindness, not because of his functional capacity at the time. Jones employed Visser because he "knew he needed the money" but "didn't give him much actual work because [we] didn't feel we could trust him to do it well." Tr. 175. Moreover, Visser reported that he stopped working April 1996 because he went to jail. Tr. 281. Regardless of the

12 -- FINDINGS AND RECOMMENDATION

reason, he did not stop working because of a definite change in his productivity or functioning, but worked despite his mental impairments only because his employer wanted to help him.

Finally, while the Commissioner relies on Dr. Garrison's hesitancy in giving an onset date, his testimony is hardly an endorsement for the position that substantial evidence supported the ALJ's finding. He simply relied on the absence of "anything that would argue against" Dr. Lange's assumption that "it's from the accident." Tr. 465. He did not specifically contradict Dr. Lange's conclusion that Visser's impairments were caused by his 1983 accident and continued through 2010.

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir), *cert denied*, 531 US 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r of Soc. Sec. Admin.*, 635 F3d 1135, 1138 (9th Cir 2011). The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id*.

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id*. The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision.

*Connett*, 340 F3d at 876, citing *Bunnell v. Sullivan*, 947 F2d 341, 348 (9th Cir 1991).  The

reviewing court declines to credit testimony when "an outstanding issue" remains.  *Luna v.*

*Astrue*, 623 F3d 1032, 1035 (9th Cir 2010).

As discussed above, the ALJ erred by finding Visser's impairment did not meet Listing

12.02(C)(2) for organic mental disorders during the period of eligibility.  The opinions of

Dr. Lange, Dr. Garrison, and Jones, if credited, provide substantial evidence to support the

conclusion that Visser's impairments met Listing 12.02(C)(2) as of his DIL.  Thus, those

opinions should be credited as true.  Although the record is sparse, it is clear that the ALJ would

be required to find Visser disabled if that evidence is credited.

## RECOMMENDATION

For the reasons discussed above, the Commissioner's decision that Visser is not disabled

should be REVERSED AND REMANDED pursuant to Sentence Four of 42 USC § 405(g) for

an award of benefits.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if

any, are due by March 24, 2014.   If no objections are filed, then the Findings and

Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a

copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings

and Recommendation will go under advisement.

DATED this 6th day of March, 2014.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

14 -- FINDINGS AND RECOMMENDATION